UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHERISSIA WILLIAMS

                    Plaintiff,

        -against-                                    Index No.:

PLAYSCRIPTS, INC. and SEAN                           **COMPLAINT**
CERCONE,                                             **Jury Trial Demanded**
                    Defendants.

Plaintiff CHERISSIA WILLIAMS ("Plaintiff" or "Ms. Williams"), by and through her attorneys, FISHER TAUBENFELD LLP, alleges against Defendants PLAYSCRIPTS, INC. ("Playscripts", the "Company" or the "Corporate Defendant") and SEAN CERCONE ("Defendant Cercone" or "Individual Defendant") as follows:

## NATURE OF THE ACTION

1.      This action arises and Plaintiff seeks damages under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (FLSA), 42 U.S.C. § 2000e et seq. ("Title VII"), New York Labor Law § 650 *et seq.* (NYLL), New York State Human Rights Law, NY Exec Law § 296 et. seq (2015) ("State Law"), and the Administrative Code of the City of New York § 8-101 *et seq.* ("City Law").

2.      Plaintiff brings this action pursuant to the FLSA and the regulations thereto and NYLL and the New York Commissioner of Labor's Wage Order (the "Wage Orders,") codified at 12 N.Y.C.R.R. 142 *et seq.*, based upon the following acts and/or omissions Defendants committed:

    i.      Defendants' failure to pay Plaintiff, who worked in excess of forty (40) hours per week, proper overtime compensation;

    ii.     Defendants' failure to provide Plaintiff with a wage notice as required by NYLL § 195; and

    iii.    Defendants' failure to provide Plaintiff with spread-of-hours payments under 12 NYCRR 142-2.4.

3.     Additionally, Plaintiff brings this action to challenge the following discriminatory and retaliatory acts and/or omissions Defendants committed in violation of Title VII, State Law, and City Law:

    i.      Defendants' discrimination in the terms and conditions of Plaintiff's employment based on her race;

    ii.     Defendants' retaliatory termination of Plaintiff's employment because of her complaints of discrimination.

**JURISDICTION AND VENUE**

4.     This Court has subject matter jurisdiction pursuant to the FLSA, 28 U.S.C. § 1337 (interstate commerce) and 28 U.S.C. § 1331 (original federal question jurisdiction). Supplemental jurisdiction over the state and city law claims is conferred by 28 U.S.C. § 1367(a), as such claims are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.     All conditions to jurisdiction under Title VII have been met. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 5, 2022 and received a Notice of her Right to Sue from the EEOC on September 15, 2022, thereby giving Plaintiff the right to proceed in Federal Court and giving this Court jurisdiction.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims alleged herein took place in this District.

7.      Pursuant to §8-502(c) of the New York City Human Rights Law, within ten days of the filing this Complaint with the Court, Plaintiff will serve a copy of this Complaint on the New York City Commission on Human Rights and on the Corporation Counsel for the City of New York.

## **PARTIES**

### *Plaintiff*

8.      Plaintiff is a New York resident and a Black woman.

9.      Plaintiff was at all times an "employee" within the meaning of State Law, protected from discrimination on the basis of race.

10.      Plaintiff was at all times a "person" within the meaning of City Law, protected from discrimination on the basis of race.

### *Defendants*

11.      The Company is a theatrical licensing company based in New York, New York.

12.      Upon information and belief, the Company is a domestic business corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 440 Park Ave S, 11th Floor, New York, NY, 10016.

13.     Upon information and belief, at all times relevant hereto, the Company has been a business or enterprise engaged in interstate commerce employing more than two (2) employees and earning gross annual sales over $500,000.

14.     Upon information and belief, at all relevant times hereto, Defendants have been and continue to be "employers" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA.

15.     Defendants constitute an enterprise within the meaning of the FLSA, 29 U.S.C. § 203(r).

16.     At all relevant times, Defendants have been Plaintiff's employers within the meaning of the NYLL §§ 2 and 651.

17.     At all relevant times, the Company has continuously been doing business in the State of New York and the City of New York and has continuously employed more than four (4) people, and accordingly is an "employer" within the definitions of State Law and City Law.

18.     Defendant Cercone is the CEO of the Company and at all relevant times held supervisory authority over Plaintiff by, inter alia, setting Plaintiff's schedule, assigning tasks to Plaintiff, and taking disciplinary action against Plaintiff. Defendant Cercone was Plaintiff's employer.

**FACTUAL ALLEGATIONS**

***Background regarding Plaintiff's Employment.***

19.     Plaintiff commenced employment at the Company as a Receptionist on December 12, 2017.

20.     On January 2, 2018, Plaintiff began a new role at the Company as a Licensing Representative.

21.     In November 2018, Plaintiff became a Professional Licensing Representative, and in January 2019, she took over her predecessor's accounts.

22.     At all times during her employment, Plaintiff was qualified for her position and was promoted multiple times. She exceeded expectations in booking and processing contracts, earning commendation and praise from customers and colleagues.

### *Defendants' Wage Violations Against Plaintiff.*

23.     On February 24, 2021, Mr. Cercone informed Plaintiff that the Company was eliminating the commission portion of her pay, but that her annual salary was being increased to compensate.

24.     On that occasion, Plaintiff was presented with a Rate of Pay notice for the first time.

25.     That pay notice made it clear to Plaintiff that the Company was treating her and had always treated her as a non-exempt employee.

26.     The pay notice included an overtime rate.

27.     Plaintiff had never been paid this overtime rate despite the fact that she frequently worked far in excess of 40 hours a week.

28.     Plaintiff's hours changed based on the season.

29.     From March 2018 to September 2018, Plaintiff worked her normal schedule from 9:00 a.m. to 5:30 p.m. Mondays through Fridays and took a lunch break of approximately one hour.

30.     From September 2018 to November 2018, during the Company's busy fall season, Plaintiff did not take a lunch break and consistently worked from 9:00 a.m. until between 7:00 or 7:30 p.m.

31.     After November 2018, Plaintiff went back to working 9:00 a.m. to 6:30 p.m. while taking a lunch break of one hour.

32.     From March through June 2019, Plaintiff went without a lunch break and regularly finished work as late as 8:00 p.m.

33.     In August 2019, when a coworker resigned from his licensing position, Plaintiff was told that she would have to take over his accounts on top of her own and while training another colleague.

34.     In Fall 2019, Plaintiff's workload increased and she began to work weekend hours and work until 7:00 or 7:30 p.m. without a lunch break.

35.     From the end of the Fall 2019 busy season until March 2020, Plaintiff could stop working at approximately 6:30 p.m. and was able to take a lunch break.

36.     In November 2019, after another licensing representative was fired, Plaintiff was the only remaining Licensing Representative on staff to handle all the Amateur accounts.

37.     As of January 2020, Plaintiff mentioned to an HR representative, Julie Tansey, that her workload was too heavy and that she was significantly underpaid.

38.     From March 2020 to September 2020, when the Coronavirus pandemic began, Plaintiff worked from 9:00 a.m. until 10:00 or 11:00 p.m. at night.

39.     Plaintiff was responsible for handling an overwhelming number of cancellations, rescheduling performances, and adding streaming licenses for titles that were available.

40.     Starting in September 2020, Plaintiff routinely worked until 2:30 or 3:30 a.m.

41.     Throughout her employment, Plaintiff frequently worked over 40 hours per week, up to 85 hours per week during the peak season after the pandemic began.

42.     Plaintiff also often worked more than 10 hours in a single day without receiving an additional hour's worth of compensation at the minimum wage, as required by New York State's Spread of Hours law.

43.     Plaintiff was the only employee in customer service for Broadway Licensing from April or May 2020 until April 2021.

44.     Plaintiff was the only person working on the Amateur Licensing musical side of the business during this time.

45.     Plaintiff's workload was such that she could not take a lunch break and ate at her desk while working through lunch.

46.     On April 27, 2020, Plaintiff was told by her eye doctor that she needed to get more sleep and limit her screen time when she began experiencing sharp pressure-like pain in her left eye.

47.     The Company and Mr. Cercone were aware that Plaintiff worked overtime because she consistently complained about her workload.

48.     Defendants were also aware that Plaintiff was eligible for overtime pay, as evidenced by the one Rate of Pay notice they provided which included an overtime rate.

49.     Defendants are liable to Plaintiff for overtime wages.

50.     Defendants are also liable for failure to provide a rate of pay notice as required by NYLL §195.

***Defendants' Racial Discrimination and Retaliation Against Plaintiff.***

51.     At all times relevant hereto, Defendants have committed the following acts and/or omissions intentionally and willfully, with knowledge that Defendants have been violating federal and state law and that Plaintiff has been and continues to be injured.

52.     Plaintiff was not promoted nor paid on par with her white counterparts for the balance of her employment with the Company.

53.     Plaintiff's annual salary as a Licensing Representative was $28,000.

54.     In 2018, Plaintiff learned that she was not paid at the same rate as other non-Black employees in the same position.

55.     Plaintiff asked Chief Executive Officer Sean Cercone for a raise.

56.     Although Plaintiff's annual salary was raised to $34,000 on August 15, 2018, she was still underpaid for her position.

57.     On April 30th, 2019, Plaintiff's salary was increased to $40,000.

58.     In May 2019, Mr. Cercone announced that he was looking to hire a Director of Licensing. Plaintiff expressed interest in the position, but Mr. Cercone rejected Plaintiff without allowing her to apply.

59.     In or around June or July 2019, Sara Skolnick, a white female, was hired into the Director of Licensing position.

60.     Plaintiff was assigned to train Ms. Skolnick, who had no licensing experience.

61.     Plaintiff complained to Mr. Cercone about not being given an opportunity to interview.

62.     On May 27, 2020, Plaintiff was promoted to Director of Amateur Licensing

without a pay increase.

63.     In July 2020, Plaintiff learned that she was still not receiving pay that was aligned with her white counterparts in similar positions.

64.     In December 2020, Plaintiff met with Brendan Conheady, Director of Operations, to inform him that she would be resigning unless she received a raise.

65.     Plaintiff requested a salary commensurate with Ms. Skolnick's, which she believed was $80,000.

66.     Plaintiff later heard from a senior employee at the Company that Ms. Skolnick's starting pay was actually $100,000.

67.     Mr. Cercone agreed to the raise.

68.     During this conversation, Mr. Cercone promised Plaintiff the position of overseeing the entire licensing department.

69.     However, just one month later, during a staff meeting, a new organizational chart was introduced reflecting that Jeff Keilholtz, a white male with no licensing experience, was now Vice President of Licensing and would be overseeing the licensing department.

70.     During a private conversation following the staff meeting, when Plaintiff expressed her disappointment that she was not given the promotion, Mr. Cercone dismissively told her that she needed to "smile more" because it did not seem she had a "positive attitude" and she was bringing down the energy of others.

71.     When Plaintiff asked for examples of times that she demonstrated a poor attitude or negatively affected others, Mr. Cercone was unable to provide any.

72.     Mr. Cercone then stated, "I'm sure you don't want to end up like Misy," referring to an employee who had been fired a few months prior.

9

73.     For the next few weeks after this exchange, Mr. Cercone sent Plaintiff messages during meetings or before Zoom conferences telling her to "smile."

74.     Plaintiff complained to Ms. Tansey that Mr. Cercone's comments made her uncomfortable, but Ms. Tansey simply brushed off the complaint and replied, "oh, he didn't mean it. Don't worry about it, just be more positive!"

75.     In February 2021, Mr. Cercone met with Plaintiff to ask how things were going with Mr. Keilholtz. Plaintiff complained that she did not understand why he was the Vice President of Licensing when he had no licensing experience.

76.     Plaintiff's promised salary increase did not take effect until Mid-April 2021, five months after her meeting with Conheady.

77.     At that time, Plaintiff's salary was increased to $90,000.

78.     Plaintiff later learned that Ms. Skolnick's salary was raised to approximately $110,000 on the same day.

79.     When Colleen McCormack, a white female, and later Kent Nicholson, a white male, were hired to replace a colleague in the same position as Plaintiff, they were both offered a higher salary than Plaintiff received, even though neither had licensing experience. Mr. Cercone said that he needed to give Mr. Keilholtz a position of power and that Mr. Keilholtz would "learn from" Plaintiff.  Plaintiff explained that it felt unfair that he was given the role when she was more qualified for the position and had been functionally operating in it for a year.

80.     Plaintiff later learned that Mr. Cercone had told another employee, Elissa Huang, that Plaintiff was not given the position because "she has an attitude."

81.     Plaintiff consulted with other Black colleagues and learned that they, too, were underpaid.

82.     Plaintiff complained to Ms. Tansey about the fact that it was unfair Mr. Keilholtz and another white individual were undeservingly promoted, while she was not. No investigation was commenced, and no remedial action was taken.

83.     On June 6, 2021, during a lunch to discuss her employment, Mr. Cercone told Plaintiff that he had a new position that he wanted her to consider. Plaintiff repeated how unhappy she had been based on her poor treatment and raised the mistreatment of another Black colleague, Tristan Halstead.

84.     On June 11, 2021, Plaintiff informed Mr. Cercone that she declined the new position he had proposed.  Mr. Cercone replied in a hostile manner, stating "because you are selfish, Jasmine [referring to Plaintiff's coworker, Ms. Jones, who is also Black] cannot be elevated because you are choosing not to elevate her."

85.     On June 26, 2021, Plaintiff learned that there was a third new hire in management who was a white male at the director level being paid more than she was.

86.     On June 18, 2020, the Company hired an EDI (Equity, Diversity, and Inclusion) coach.  A few employees of color, including Plaintiff, met with the coach. Plaintiff raised the lack of diversity and inclusion at the Company.  The EDI coach relayed Plaintiff's concerns to Mr. Cercone. Shortly thereafter, the EDI coach's services were terminated.

87.     In March 2021, a new EDI facilitator was hired. During EDI training on April 28, Plaintiff raised the fact that the Company catalog was not diverse. Mr. Cercone grew irate and aggressive, would not let anyone speak, and ranted about not being a "racist."

88.     Mr. Cercone asked to meet with Plaintiff alone after the meeting. He reprimanded Plaintiff for "calling him out with false claims." In response, Plaintiff pulled up the Company website and showed the authors' pages and asked him to count the number of authors

11

of color in the catalog and the number of employees of color on the all-white executive team. Mr. Cercone grew defensive and told Plaintiff that she should be happy about the fact that she worked her way up in the Company.

89.     Plaintiff complained to the new EDI moderator about this conversation with Mr. Cercone. The EDI moderator responded days later, stating that he was working with Mr. Cercone to improve his views on the situation and that he had an action plan spanning the next two years, but no remedial action was, in fact, taken.

90.     On May 5, 2021, Mr. Keilholtz reprimanded Plaintiff for her "attitude" and "tone." As evidence for this claim, Mr. Keilholtz pointed to an email Plaintiff wrote, but when pressed he could not identify any "unprofessional" sentences. He then changed the topic to Plaintiff's "behavior" during the EDI training and said that Plaintiff didn't "smile or look positive." Plaintiff asked Mr. Keilholtz why, as the only Black employee in management, she was constantly told to smile. Plaintiff also asked whether a white employee who had cursed at Mr. Keilholtz on a Zoom meeting was reprimanded in the same way.  Mr. Keilholtz argued that he was having the same conversation with other employees, mentioning Ms. Jones.

91.     After this meeting with Mr. Keilholtz, Plaintiff complained to Ms. Tansey, who assured Plaintiff that she would not be reprimanded unfairly again. However, she took no remedial action in response to my discrimination complaint.

92.     Plaintiff also spoke to Ms. Skolnick, who offered to speak with Mr. Keilholtz. Ms. Skolnick later informed Plaintiff that Mr. Keilholtz was very defensive about the matter.

93.     In a follow-up conversation between Mr. Cercone and Plaintiff, Mr. Cercone reviewed the email that Mr. Keilholtz cited as unprofessional and acknowledged the lack

of merit to Keilholtz's interpretation.

94.    On July 27, 2021, Ms. Jones resigned from her employment with the Company.

95.    Plaintiff informed Mr. Cercone that Ms. Jones had been unhappy for a long time.  Plaintiff also expressed how unhappy she had been and how difficult it was to work for Mr. Keilholtz.

96.    The very next day, Mr. Cercone summarily fired Plaintiff in retaliation for her discrimination complaints.

## FIRST CAUSE OF ACTION
### (FLSA Overtime Wage Violations)

97.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

98.    Throughout the statute of limitations period covered by these claims, Plaintiff regularly worked in excess of forty (40) hours per workweek.

99.    At all relevant times hereto, Defendants have had and operated under a decision, policy and plan, and under common policies, programs, practices, procedures, protocols, routines and rules of knowingly and willfully failing and refusing to pay Plaintiff at one and a half times their regular rate of pay for all hours of work in excess of forty (40) hours per workweek, and willfully failing to keep required records, in violation of the FLSA.

100.   Plaintiff seeks damages in the amount of her respective unpaid compensation, liquidated (double) damages as provided by the FLSA, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
### (NYLL Overtime Wage Violations)

101.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

102.    New York law prohibits an employer from permitting an employee to work without paying overtime wages of 150% of his or her regular rate for all hours worked in excess of forty (40) in any workweek.

103.    Throughout the statute of limitations period covered by these claims, Defendants knowingly, willfully, regularly and repeatedly failed to pay Plaintiff at the required overtime rates, one and a half times her regular rate of pay, for hours worked in excess of forty (40) per workweek.

104.    As a direct and proximate result of Defendants' willful and unlawful conduct, as set forth herein, Plaintiff has sustained damages and seeks recovery for unpaid wages in an amount to be determined at trial, attorneys' fees, costs, liquidated damages and prejudgment interest as provided by NYLL § 663 and supporting regulations, and such other legal and equitable relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION
### (NYLL Failure to Notify)

105.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

106.    Pursuant to §195 of the NYLL, Defendants were required to provide Plaintiff with a wage notice.

107.    Defendants failed to provide Plaintiff with a proper wage notice in accordance with §195 of the NYLL until several years into her employment.

14

108.    As a direct and proximate result of Defendants' unlawful conduct, as set forth herein, Plaintiff has sustained damages and seek damages in accordance with §198 of the NYLL for each week Defendants failed to provide such wage notice and statements, along with attorneys' fees, costs and prejudgment interest as provided by NYLL § 198 and supporting regulations, and such other legal and equitable relief as this Court deems just and proper.

### FOURTH CAUSE OF ACTION
#### (NYLL Spread-of-Hours)

109.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

110.    Pursuant to 12 NYCRR 142-2.4, Defendants had an obligation to compensate Plaintiff for one hour's pay at the minimum wage for each hour she worked in excess of 10 hours in a given day.

111.    Although Plaintiff frequently worked more than 10 hours in a single day, Defendants failed to compensate Plaintiff for one hour's pay at the minimum wage when she did so.

112.    As a direct and proximate result of Defendants' willful and unlawful conduct, as set forth herein, Plaintiff has sustained damage and seeks recovery for unpaid spread-of-hours payments in an amount to be determined at trial, attorneys' fees, costs, liquidated damages and prejudgment interest as provided by NYLL § 663 and supporting regulations, and such other legal and equitable relief as this Court deems just and proper.

### FIFTH CAUSE OF ACTION
#### (Race Discrimination in Violation of Title VII)

113.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

114.    Playscripts willfully violated federal law when it subjected Plaintiff to

discrimination in the terms and conditions of her employment on the basis of her race, such as by paying her differently from similarly-situated white colleagues.

115.    As a proximate result of the Playscript's unlawful acts of discrimination, Plaintiff has endured emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to her reputation.

116.    As a proximate result of Playscript's unlawful acts of discrimination, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

## SIXTH CAUSE OF ACTION
### (Race Discrimination in Violation of State Law)

117.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

118.    Defendants willfully violated State Law when they subjected Plaintiff to discrimination in the terms and conditions of her employment on the basis of her race, such as by paying her differently from similarly-situated white colleagues.

119.    As a proximate result of the Defendants' unlawful acts of discrimination, Plaintiff has endured emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to her reputation.

120.    As a proximate result of the Defendants' unlawful acts of discrimination, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

## SEVENTH CAUSE OF ACTION
### (Race Discrimination in Violation of City Law)

121.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

122.    Defendants willfully violated City Law when they subjected Plaintiff to discrimination in the terms and conditions of her employment on the basis of her race, such as by paying her differently from similarly-situated white colleagues.

123.    As a proximate result of Defendants' unlawful acts of discrimination, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to her reputation.

124.    As a proximate result of the Defendants' unlawful acts of discrimination, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

## EIGHTH CAUSE OF ACTION
### (Retaliation in Violation of Federal Law)

125.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

126.    By the acts and practices described above, Playscripts terminated Plaintiff in retaliation for Plaintiff complaining of race discrimination, in violation of the Title VII.

127.    Playscripts knew that its actions constituted retaliation and willfully disregarded Plaintiff's statutorily protected rights.

128.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, humiliation, and damage to her reputation as a proximate

result of Defendants' retaliatory practices, unless and until this Court grants the relief hereinafter described.

## NINTH CAUSE OF ACTION
### (Retaliation in Violation of State Law)

129.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

130.    By the acts and practices described herein, Defendants intentionally and willfully violated State Law by retaliating against Plaintiff for complaining about racial discrimination.

131.    As a proximate result of Defendants' unlawful retaliation, Plaintiff has endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to her reputation.

132.    As a proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

## TENTH CAUSE OF ACTION
### (Retaliation in Violation of City Law)

133.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

134.    By the acts and practices described herein, Defendants intentionally and willfully violated City Law by retaliating against Plaintiff for complaining about racial discrimination.

135.    As a proximate result of Defendants' unlawful retaliation, Plaintiff has

endured emotional pain, emotional suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of personal dignity, loss of self-esteem, loss of career fulfillment, embarrassment, humiliation and harm to her reputation.

136.    As a proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer substantial losses in past and future earnings and other fringe benefits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment awarding:

A. Compensatory Damages in an amount to be determined at trial;

B. Prejudgment Interest;

C. Liquidated Damages pursuant to the FLSA and NYLL;

D. Back Pay, Front Pay, and damages for all employment benefits Plaintiff would have received but for the discriminatory and retaliatory acts and practices of Defendants;

E. Compensatory, punitive, mental anguish, pain and suffering damages sustained as a result of Defendants' discriminatory and retaliatory conduct; and

F. Plaintiff's costs and reasonable attorneys' fees.

## JURY DEMAND

Plaintiff demands trial by jury of all issues as of right by a jury.


Dated:  November 9, 2022

Respectfully submitted,

By: _____
Liane Fisher, Esq.
FISHER TAUBENFELD LLP
225 Broadway, Suite 1700
New York, New York 10007
Phone: (212) 571-0700
*Attorneys for Plaintiff*